UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



08 CV 7063

---------------------------------------------- x

MICHAEL RUBIN, Individually and On
Behalf of All Others Similarly Situated,

                  Plaintiff,

    vs.

SEMGROUP ENERGY PARTNERS, L.P.,
SEMGROUP ENERGY PARTNERS G.P.
LLC, SEMGROUP HOLDINGS L.P., KEVIN
L. FOXX, MICHAEL J. BROCHETTI, ALEX
G. STALLINGS, THOMAS L. KIVISTO,
GREGORY C. WALLACE, W. ANDERSON
BISHOP, BRIAN F. BILLINGS, CITIGROUP
GLOBAL MARKETS INC., MERRILL
LYNCH, PIERCE, FENNER & SMITH
INCORPORATED and LEHMAN
BROTHERS, INC.,

              Defendants.

---------------------------------------------- x

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

RECEIVED
AUG 08 2008
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, Michael Rubin, on behalf of himself and all others similarly situated, by and through his undersigned attorneys, alleges the following based upon knowledge, with respect to his own acts, and based upon facts obtained through the investigation by his counsel.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of SemGroup Energy Partners, L.P. ("SGLP" or the "Partnership") common units between July 17, 2007 and July 17, 2008, inclusive (the "Class Period"), against SGLP and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act"), and on behalf of all purchasers of SGLP's common units acquired pursuant and/or traceable to the Registration Statement and Prospectus issued in connection with the Partnership's Initial Public Offering completed on or about July 23, 2007 ("IPO"), as well as all purchasers of SGLP common units acquired pursuant and/or traceable to the Registration Statement and Prospectus issued in connection with the Partnership's Secondary Offering completed on or about February 20, 2008 ("Secondary Offering"), seeking to pursue remedies under the Securities Act of 1933 (the "1933 Act").

2     The Registration Statements and Prospectuses issued in connection with the IPO and Secondary Offering were materially false and misleading, and/or omitted material information necessary to make the statements made, in light of such material omissions, not materially false and misleading.

3.     In addition, during the Class Period, a continuous course of conduct was undertaken that operated as a fraud and deceit upon plaintiff and the Class. Various untrue and/or misleading statements of material facts were made, and material facts necessary in order to make the statements not misleading, were omitted. The various statements and/or omissions made during the Class Period were made with a severely reckless disregard for the truth and were intended to, and did, deceive the investing public, including plaintiff and other Class members

4      The Registration Statements and Prospectuses issued in connection with the IPO and Secondary Offering and the statements made during the Class Period failed to disclose the adverse financial condition and lack of liquidity of SemGroup L.P. (SGLP's parent (the "Parent"), from whom the Partnership derives more than 80% of its revenue) as a result of its speculative, dangerous and unauthorized hedging and trading in crude oil.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action under §22 of the 1933 Act, 15 U.S.C. §77v, and §27 of the 1934 Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337. The claims alleged herein arise under §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77k, 77(l)(a)(2) and 77o, and §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations of the Securities and Exchange Commission ("SEC") promulgated thereunder, including Rule 10b-5, 17 C.F.R. §240.10b-5.

6.     Venue is proper in this District pursuant to §22 of the 1933 Act, §27 of the 1934 Act, and 28 U.S.C. §1391(c). Many of the acts and transactions that give rise to the violations of law alleged herein, including the dissemination to the public of materially false and misleading press releases and filings with the SEC, occurred in this District. In addition, SGLP's common units trade on the NASDAQ, a national securities exchange.

7.     In connection with the acts alleged herein, the defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mails.

## PARTIES

8.     Plaintiff Michael Rubin purchased SGLP common units in the Partnership's IPO on or around July 23, 2007 as set forth in the accompanying certification which is incorporated herein by reference, and was damaged thereby.

9.    Defendant SGLP is a limited partnership formed in 2007. SGLP owns and operates a diversified portfolio of midstream energy assets, including storage facilities, terminals and pipelines in the United States. SGLP is a publicly traded master limited partnership whose common units trade on the NASDAQ under the symbol "SGLP."

10.    SGLP provides terminalling, storage, gathering, and transportation services for companies engaged in the production, distribution, and marketing of crude oil. It owns and operates an aggregate of approximately 6.7 million barrels of storage capacity. These oil-related assets were contributed to the Partnership by the Parent in connection with the Partnership's IPO in July 2007. SGLP also owns and operates 46 liquid asphalt cement terminals, which provide liquid asphalt cement terminal and storage services in the continental United States.

11.    Defendant SemGroup Energy Partners G.P. LLC ("SemGroup GP" or the "General Partner") is the general partner of SGLP. It is wholly owned by the Parent, and they both share the same senior management. SemGroup GP has the power to and does direct the operations of SGLP. The General Partner, by its officers and directors, signed or authorized both the IPO and Secondary Offering Registration Statements on behalf of SGLP.

12.    Defendant SemGroup Holdings L.P. ("SemGroup Holdings") is the limited partner of SGLP. It is a wholly owned subsidiary of the Parent. The members of the board of directors of the General Partner are chosen by SemGroup Holdings. SemGroup Holdings beneficially owns all of the subordinated units of the Partnership. SemGroup Holdings sold 12.5 million common units in the IPO.

13.    Defendant Kevin L. Foxx ("Foxx") co-founded the Parent in April 2000 and is the Parent's Executive Vice President and Chief Operating Officer. He also serves as Executive Vice President and Chief Operating Officer of SemCrude, L.P. and SemCanada Crude Company.

- 3 -

Additionally, Foxx is the President, Chief Executive Officer and a director of SGLP. He signed or authorized the Registration Statements in connection with both the IPO and Secondary Offering.

14. Defendant Michael J. Brochetti ("Brochetti") has served as Chief Financial Officer and director of SemGroup GP since February 2007 and has served in those capacities for SGLP since its IPO. In addition, Brochetti has served as the Senior Vice President at the Parent since October 2005. Brochetti signed or authorized both the IPO and Secondary Offering Registration Statements.

15. Defendant Alex G. Stallings ("Stallings") has served as Chief Accounting Officer of SemGroup GP since February 2007 and has served in that same capacity for SGLP since its IPO. In addition, Stallings has served as the Parent's Chief Accounting Officer since September 2002 and directs the financial and accounting operations of both the Parent and SGLP. Stallings signed or authorized both the IPO and Secondary Offering Registration Statements.

16. Defendant Thomas L. Kivisto ("Kivisto") has served as a director of SemGroup GP since May 2007 and has served in that same capacity for SGLP since its IPO. In addition he has served as the Parent's Chief Executive Officer and President since co-founding the Parent in 2000. Kivisto signed or authorized both the IPO and Secondary Offering Registration Statements.

17. Defendant Gregory C. Wallace ("Wallace") has served as a director of SemGroup GP since May 2007 and has served in that same capacity for SGLP since its IPO. In addition he has served as the Parent's Chief Financial Officer, Vice President and Secretary since 2000. Wallace signed or authorized both the IPO and Secondary Offering Registration Statements.

18. Defendant W. Anderson Bishop ("Bishop") has served as a director of SemGroup GP since July 17, 2007 and has served in that same capacity for SGLP since its IPO. Bishop signed or authorized both the IPO and Secondary Offering Registration Statements.

19.    Defendant Brian F. Billings ("Billings") has served as a director of SemGroup GP and SGLP since October 3, 2007. Billings signed or authorized the Secondary Offering Registration Statement.

20.    Defendants, Foxx, Brochetti, Stallings, Kivisto, Wallace, Bishop and Billings are referred to herein as the Individual Defendants.

21.    Citigroup Global Markets Inc. ("Citigroup") acted as joint bookrunning manager and representative of all other underwriters in both SGLP's IPO – which offered and sold 14,375,000 common units to the public for gross proceeds of approximately $316,250,000 before expenses – and SGLP's Secondary Offering – which offered and sold an additional 6 million common units to the public for gross proceeds of approximately $143,400,000 before expenses.

22    Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") acted as joint bookrunning manager and representative of all other underwriters in SGLP's IPO – which offered and sold 14,375,000 common units to the public for gross proceeds of approximately $316,250,000 before expenses.

23.    Lehman Brothers, Inc. ("Lehman") acted as joint bookrunning manager and representative of all other underwriters in SGLP's Secondary Offering – which offered and sold an additional 6 million common units to the public for gross proceeds of approximately $143,400,000 before expenses.

24    Citigroup, Merrill Lynch and Lehman are referred to herein as the Underwriter Defendants

## CLASS ACTION ALLEGATIONS

25.    Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who purchased or otherwise acquired SGLP common units during the Class Period,

including all persons who purchased or otherwise acquired SGLP common units pursuant or traceable to the Registration Statement and Prospectus issued in connection with the IPO and the Registration Statement and Prospectus issued in connection with the Secondary Offering. Excluded from the Class are (i) defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of SGLP, the Parent, the General Partner, SemGroup Holdings or any of the Underwriter Defendants (or any other underwriter on the IPO) at the time of the IPO or during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any defendant has or had a controlling interest; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

26.    The Class is so numerous that joinder of all Class members is impracticable. Throughout the Class Period, SGLP units were actively traded on the NASDAQ, an efficient national securities market. While the exact number of Class members can only be determined by appropriate discovery, plaintiff believes that Class members number in the thousands. As of May 2, 2008, there were 21,275,000 common units of SGLP issued and outstanding. SGLP units are followed by securities analysts employed by major brokerage firms who wrote reports that were disseminated to the sales force and to certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

27.    Plaintiff's claims are typical of the claims of other Class members. Plaintiff and all Class members acquired their SGLP units pursuant to one of the Registration Statements and Prospectuses or on the open market, and sustained damages as a result of defendants' wrongful conduct complained of herein in violation of the federal securities laws.

28.    Plaintiff will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class action and securities litigation. Plaintiff

- 6 -

has no interests that are contrary to or in conflict with those of the Class members that plaintiff seeks to represent.

29. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

30. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether documents, press releases and public statements made by the defendants during the Class Period concerning the Partnership's financial and operational position, including statements concerning SGLP's Parent and its financial liquidity, contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c) whether SGLP and the defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

(d) whether the market price of SGLP common units during the Class Period were artificially inflated due to the material misrepresentations complained of herein; and

(e) whether, in connection with the 1934 Act claims, the Class members have sustained damages and, if so, the appropriate measure thereof.

31.    Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

32.    The names and addresses of record owners of SGLP common units purchased pursuant or traceable to the IPO and Secondary Offering and during the Class Period are available from records maintained by SGLP or its transfer agent. Notice may be provided to such record owners via first class mail, using techniques and a form of notice similar to that customarily used in securities class actions

33.    In bringing these claims, plaintiff and the members of the Class are entitled to the presumption of reliance established by the fraud-on-the-market doctrine. At all times relevant to this Complaint, the market for SGLP common units was efficient for the following reasons, among others:

(a)    SGLP common units trade on the NASDAQ, which is a highly efficient market;

(b)    as a regulated issuer, SGLP filed periodic public reports with the SEC;

(c)    SGLP common units were followed by numerous securities analysts employed by firms who wrote reports about the Partnership and the value of its securities that were publicly available and entered the public marketplace;

(d)    SGLP regularly issued press releases, which were carried by national and international news wires and were publicly available and entered into the public marketplace; and

(e)    the market price of SGLP common units reflected the effect of news disseminated in the market.

34.    As a direct and proximate result of the wrongful conduct by defendants, plaintiff and the other members of the Class suffered damages in connection with their purchases of SGLP

- 8 -

common units. Had plaintiff and the other members of the Class known of the material adverse information not disclosed by defendants, or been aware of the truth behind the material misstatements of the defendants, they would not have purchased SGLP common units at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

35.    SGLP is a public limited partnership run by its General Partner, SemGroup GP, a wholly owned subsidiary of the Parent. The Parent is a privately held company with significant operations in the oil business.

36.    In July 2007, SGLP was partially spun off via its IPO with 14,375,000 common units (after the exercise of the underwriters' over allotment) at $22.00 per unit. Subsequent to the IPO, the common units offered to the public represented an aggregate 52.3% limited partner interest in SGLP, while the Parent retained the remaining interest through its 100% ownership interest in the General Partner. SGLP does not directly employ anyone to manage its business. Rather, the General Partner manages SGLP's operations and activities, and its board of directors and officers make decisions on its behalf. In addition, a number of the directors and officers of the General Partner are also officers of the Parent. Thus, SGLP, through its General Partner, had the same knowledge of the Parent's business operations (and speculative hedging strategy) as the Parent itself.

37.    In connection with the IPO, SGLP entered into a Throughput Agreement with its Parent, requiring SGLP to provide crude oil gathering, transportation, terminalling and storage services for its Parent. The Parent was obligated to pay SGLP a fee based on the number of barrels of crude oil gathered, transported, terminalled or stored on behalf of the Parent. The Parent was committed to use SGLP's services at a level that provided SGLP with minimum monthly fees of $6.4 million, totaling $76.8 million annually. For the year ending December 31, 2006 and the

- 9 -

quarter ending March 31, 2007, the Parent represented approximately 82.5% and 82.4%, respectively, of SGLP's revenues

38.    Beginning in approximately July 2006, petroleum product prices began experiencing unusual price volatility and the Parent's hedging strategy began to fail. For example, during the three months ended March 31, 2008, the Parent posted $1.96 billion to satisfy margin deposit requirements, a 115% increase over the three months ended March 31, 2007.

39.    During the twelve months ended December 31, 2007, the Parent and its affiliates posted $1.70 billion to satisfy margin deposit requirements, a 159% increase over the twelve months ended December 31, 2006.

40.    In an effort by the Parent to improve its liquidity, on January 14, 2008, in a press release issued after the close of the markets, SemMaterials, L.P. ("SemMaterials"), a subsidiary of the Parent, announced that it had agreed to sell 46 U.S. liquid asphalt cement and residual fuel oil terminalling and storage facilities to SGLP for $378.8 million.

41.    Pursuant to a Terminalling Agreement executed between the Parent and SGLP in connection with the sale of the facilities, the Parent increased its minimum annual obligations to SGLP by $58.9 million.

42.    Between July 17, 2007 and July 23, 2007, SGLP accomplished its IPO of 14.4 million shares at $22 per share (including 1.875 million shares due to an overallotment) for net proceeds of $316.3 million, pursuant to the IPO Registration Statement. The majority of the proceeds from the offering went to SemGroup Holdings. In its first day of trading, SGLP's units closed at $29.32 per share on July 18, 2007.

43.    The IPO Registration Statement and IPO Prospectus were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to

make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

44     The IPO Registration Statement and IPO Prospectus made the following representations regarding SGLP's relationship with the Parent and the risks surrounding the Parent's business operations:

> We are a Delaware limited partnership recently formed by our Parent, a provider of midstream energy services, to own, operate and develop a diversified portfolio of complementary midstream energy assets. We currently provide crude oil gathering, transportation, terminalling and storage services primarily in our core operating areas in Oklahoma, Kansas and Texas. Prior to the closing of this offering, we will enter into the Throughput Agreement pursuant to which we will provide crude oil gathering, transportation, terminalling and storage services to our Parent. Our Parent will pay us a fee based on the number of barrels of crude oil we gather, transport, terminal or store on behalf of our Parent and will commit to utilize our services at a level that will provide us with minimum revenues of $6.4 million per month. We intend to acquire and construct a significant amount of additional midstream energy assets, including acquisitions from our Parent and jointly with our Parent. At March 31, 2007, our Parent had total net book value of property, plant and equipment of $1.1 billion, with the crude oil gathering, transportation, terminalling and storage assets to be contributed to us prior to the closing of this offering representing approximately $102.0 million of this amount.

> Our network of assets provides our customers the flexibility to access multiple points for the receipt and delivery of crude oil. We do not take title to, or marketing responsibility for, the crude oil that we gather, transport, terminal and store. As a result, our operations have minimal direct exposure to changes in crude oil prices, but the volumes of crude oil we gather, transport, terminal or store are indirectly affected by commodity prices. We generate revenues by charging a fee for services provided at each transportation stage as crude oil is shipped from its origin at the wellhead to destination points such as the Cushing Interchange, to refineries in Oklahoma, Kansas and Texas or to pipelines, as described below:

> \*     \*     \*

> We derive a *substantial majority of our revenues from services provided to the crude oil purchasing, marketing and distribution operations of our Parent pursuant to the Throughput Agreement. For the year ended December 31, 2006 and the three months ended March 31, 2007, our Parent represented approximately 82.5% and 82.4%, respectively, of our pro forma revenues and third parties accounted for the remainder.* Our Parent's crude oil purchasing, marketing and distribution operations are substantially dependent on our services and assets. The Throughput Agreement has an initial term of seven years with additional

- 11 -

automatic one-year renewals unless either party terminates the agreement upon prior notice. Our Parent will pay us a fee based on the number of barrels we gather, transport, terminal or store on behalf of our Parent and will commit to utilize our services at a level that will provide us with minimum revenues of $6.4 million per month, which we expect to be sufficient to initially pay nearly all of the minimum quarterly distribution on our common units but no distribution on our subordinated units. Our Parent will be obligated to pay us fees in respect of this minimum commitment, regardless of whether such services are actually utilized by our Parent.

**Competitive Strengths**

We believe we are well positioned to successfully achieve our primary business objectives and execute our business strategies based on the following competitive strengths:

- *Stable, fee-based, contracted cash flows. We believe our fee structure enhances our ability to generate stable and predictable cash flows. Pursuant to the Throughput Agreement, our Parent will commit to services at a level that will provide us with minimum revenues of $6.4 million per month. Our operations have minimal direct exposure to commodity price fluctuations because we do not own or take title to any of the crude oil that we gather, transport, terminal or store in these operations, but the volumes of crude oil we gather, transport, terminal or store are indirectly affected by commodity prices.*

- *Significance and versatility of our Cushing terminal.* Our primary terminalling and storage facilities are located within the Cushing Interchange, one of the largest crude oil marketing hubs in the United States and the designated point of delivery specified in all NYMEX crude oil futures contracts. We believe that the Cushing Interchange will continue to serve as one of the largest crude oil marketing hubs in the United States. Given this belief and the supply-demand imbalance in the Midwest region of the United States, we expect that our Cushing terminal and its network of complementary assets will continue to provide our Parent and our other customers the ability to effectively manage their crude oil inventories and the flexibility to service their businesses efficiently and to increase their profitability. In addition, we have identified opportunities, should market conditions warrant, to expand our storage capacity and operations at our Cushing terminal to capture incremental crude oil throughput within the Cushing Interchange. We own approximately 26 acres of additional land within the Cushing Interchange where we can develop additional storage capacity.

- *Strategically located pipeline and transportation assets.* We have over 1,150 miles of strategically positioned gathering and

transportation pipelines in Oklahoma and Texas. Our Mid-Continent system provides the ability to gather wellhead crude oil from approximately 11,000 wells and transport crude oil directly to our Cushing terminal and other storage facilities, refineries or common carrier pipelines. Our Longview system is a tariff-regulated crude oil pipeline that delivers crude oil to terminalling, refinery and storage facilities at various delivery points in East Texas. We believe that the ability of our systems to transport crude oil to multiple end points, particularly the Cushing Interchange, creates increased demand for our systems, which will in turn result in increased volumes through our systems by allowing our customers, including our Parent, the flexibility to more effectively manage their marketing of crude oil and thereby increase their profitability. In addition, we provide two types of trucking services, crude oil transportation services and producer field services, that complement our pipeline infrastructure.

- *Relationship with our Parent.* We expect that our relationship with our *Parent will provide us with significant business opportunities. Our Parent will own a significant economic interest in us, including indirect ownership of a 49.1% limited partner interest, a 2% general partner interest and incentive distribution rights. Our Parent has indicated that it intends to use us as a growth vehicle to pursue the acquisition and expansion of midstream energy businesses and assets. Following this offering, our Parent will continue to own a diversified portfolio of midstream energy assets in the United States, Canada, Mexico and the United Kingdom.* Although we expect to have the opportunity to make acquisitions directly from, or jointly with, our Parent in the future, we cannot say with any certainty which, if any, acquisition opportunities may be made available to us or if we will choose to pursue any such opportunity.

- *Well maintained and efficient properties and facilities.* Our gathering, transportation, terminalling and storage systems have been well maintained, resulting in reliable and efficient operations. In December 2000, the United States Congress passed a new pipeline safety act implementing new regulations to ensure the safety and integrity of pipeline systems. These regulations require pipeline companies to regularly evaluate the risk of failure of their pipelines and to conduct physical inspections and implement repairs to affected pipeline systems at a minimum of every five years to ensure they operate in a manner that is safe to the public and the environment. We utilize this continuous pipeline integrity process to evaluate risks to our system through in-line inspection and hydrostatic testing to ensure that we operate in compliance with these regulations, which we believe results in lower costs, minimal downtime and safer operations.

- *Financial flexibility to pursue expansion and acquisition opportunities.* Prior to the closing of this offering, we will enter into a new $250 0 million five-year credit facility pursuant to which we will have approximately $112 5 million of borrowing capacity available for general partnership purposes We believe the available capacity under this new facility combined with our ability to access the capital markets should provide us with a flexible financial structure that will facilitate our organic expansion and acquisition strategy.

- *Experienced management team. Our Parent has an experienced and knowledgeable executive management team with an average of more than 20 years' experience in the energy industry who collectively owns an approximate 30.5% interest in our Parent. We expect to directly benefit from this management team's strengths. The management team has significant experience in the implementation of acquisition, operating and growth strategies in many facets of the energy industry, specifically including crude oil marketing, gathering, transportation, terminalling and storage and other midstream businesses. In addition, the management team has established strong relationships throughout the energy industry with producers, marketers and refiners of crude oil in the United States, which we believe will be beneficial to us in pursuing our own acquisition and organic expansion opportunities.*

## Business Strategies

*Our primary business objectives are to maintain stable cash flows and to increase distributable cash flow per unit over time by becoming a leading provider of midstream services to the energy industry* We intend to accomplish these objectives by executing the following strategies:

- *Leveraging our relationship with our Parent. Our relationship with our Parent provides us access to its extensive pool of operational and commercial expertise.* We intend to pursue acquisition opportunities as well as organic growth opportunities with our Parent. For example, as is frequently the case in the energy industry, potential acquisition opportunities may have an element of commodity price risk inherent in their pre-acquisition operations. We expect to be able to pursue such acquisitions jointly with our Parent in a manner that minimizes the direct commodity price exposure to us. In these circumstances, our Parent or one of its affiliates may retain the portion of the acquired business that has direct commodity price exposure and thereby assume most or all of the direct commodity price exposure inherent in the acquired business and incorporate these risks into its overall distribution and marketing operations. We could retain assets and the other portions of the

- 14 -

acquired business that do not have direct commodity price exposure. As a result of our affiliation with our Parent, we believe we will be able to aggressively pursue acquisitions that otherwise would not be attractive to us or other midstream service providers because of the commodity price risk inherent in the acquired business' operations. We may also acquire additional assets or businesses directly from our Parent, including assets constructed by our Parent, which will provide us access to a broad array of growth opportunities. Our Parent is not, however, obligated to offer any such acquisition opportunities to us and we are not obligated to purchase any assets or businesses that our Parent might offer to us.

- *Pursuing both strategic and accretive acquisitions.* We intend to pursue both strategic and accretive acquisitions within the midstream energy industry, both independently and jointly with our Parent, that will enable us to grow our distributable cash flow per unit and enhance our service capabilities to our Parent and our other customers. We will seek acquisition opportunities in our existing areas of operation that have the potential for operational efficiencies, including higher capacity utilization as well as expansion of those assets. We also may examine midstream energy acquisition opportunities outside our existing area of operations and in new geographic regions.

- *Pursuing organic expansion opportunities.* We will continually evaluate opportunities to expand our existing asset base and we will consider constructing additional assets in strategic locations that will allow us to leverage our existing market position and our core competitiveness in the crude oil gathering, transportation, terminalling and storage businesses. When necessary to meet increases in demand for crude oil, we will consider increasing storage capacity at our existing facilities. We will also evaluate adding new gathering and transportation assets to meet increasing demand and to improve integration with our terminalling and storage facilities. We have the ability to expand capacity at our Cushing terminal either individually or through joint development opportunities with our Parent. Over the last five years, our Parent has added approximately 3.6 million barrels of new crude oil storage capacity to our Cushing terminal. The combination of our undeveloped acreage and connectivity within the Cushing Interchange provides us with a competitive advantage to develop new terminalling and storage assets at this location to meet additional demand.

- *Increasing the profitability of our existing assets.* We expect to improve our operating efficiency and to reduce our costs by monitoring and controlling our cost structure. We intend to make investments to improve the efficiency of our operations and pursue

cost saving initiatives. Currently, we are evaluating opportunities to increase profitability of our existing operations by utilizing excess pipeline and storage capacity to transport and store new supplies of crude oil at minimal incremental cost and by adding third-party volumes to our system directly or through our Parent.

## Our Relationship with our Parent

A substantial majority of our revenues are generated by providing services to our Parent's crude oil purchasing, marketing and distribution operations. Our Parent is a privately owned company that provides gathering, transportation, storage, distribution, marketing and other midstream services primarily to independent natural gas and crude oil producers, as well as refiners located along the North American energy corridor from the Gulf Coast to Central Canada and the West Coast of the United Kingdom *Our Parent has a significant asset base consisting primarily of pipelines, gathering systems, processing plants, storage facilities, terminals and other distribution facilities located between North American production and supply areas including the Gulf Coast and Mid-Continent regions of the United States and the province of Alberta, Canada and high demand regions such as the Midwest*

Since our Parent's inception in April 2000 through March 31, 2007, our Parent has completed 47 acquisitions at an aggregate purchase price of approximately $978 million, excluding amounts paid for working capital. Our Parent has indicated that it intends to use us as a growth vehicle to pursue the acquisition and expansion of midstream energy businesses and assets. Our Parent believes that by contributing crude oil gathering, transportation, terminalling and storage operations to a publicly traded partnership, these operations will have a greater value and a lower cost of capital than could be obtained by operating the assets in a separate business segment of our Parent. As a publicly traded limited partnership, we will have greater liquidity, which we believe will enhance our valuation. In addition, as a publicly traded partnership, we will have the ability not only to access the public capital markets (which we believe will enable us to have lower overall capital cost than available in private markets resulting in a lower cost of capital and funding costs) but also to use our units as consideration for potential future acquisitions. However, as a result of being a publicly traded partnership, we will incur increased legal, accounting and other expenses associated with additional regulatory and compliance matters.

\*       \*       \*

Our Parent conducts its business through the following seven operating divisions:

- *SemCrude* – SemCrude markets crude oil purchased from producers and other suppliers to refiners and other customers. SemCrude's purchasing, marketing and distribution operations include the purchase of crude oil at the wellhead and the bulk purchase of crude

oil at pipeline and terminal facilities. After utilizing our pipelines, terminals and trucks or similar services offered by other providers, SemCrude subsequently resells or exchanges the crude oil at various delivery points.

Although SemCrude will continue to market crude oil following this offering, a substantial majority of the physical assets of SemCrude's business, including the assets and services that comprise the Crude Oil Business, will be transferred to us prior to the closing of this offering. SemCrude will retain gathering and transportation pipeline systems in Kansas and Oklahoma with a combined length of approximately 620 miles. SemCrude will also retain approximately 150 acres within the Cushing Interchange that will be available for expansion and currently is in the planning stage of constructing additional storage capacity. Pursuant to the Throughput Agreement, we will continue to support SemCrude's crude oil marketing operations `

On February 9, 2007, our Parent announced that White Cliffs Pipeline, L.L.C., a majority owned subsidiary of SemCrude, will build an approximate 550 mile crude oil pipeline extending from Colorado's DJ Basin, an area well known for its oil and natural gas reserves, to our Cushing terminal. The pipeline will be owned and operated by SemCrude and is expected to be operational by January 2009. We will not receive any transportation revenues from shipments on this pipeline.

- *SemFuel* – SemFuel purchases, ships, stores, markets and distributes gasoline and distillates. SemFuel purchases inventory and utilizes its preferred shipper status on key third-party pipelines, including Magellan, Valero/Kaneb, Explorer, TEPPCO and West Shore, and owned and leased terminals and storage facilities to supply its customers. As of March 31, 2007, SemFuel's assets included four owned terminals and one leased terminal, five bulk distribution facilities in the Midwest, strategically located storage tanks totaling more than 3.2 million barrels of owned and leased storage capacity (including approximately 0.8 million barrels of storage capacity at the Tulsa/Glenpool, Oklahoma hub and another 0.2 million barrels of storage capacity currently under construction in El Dorado, Kansas) and delivery capacity at numerous rack terminals in 15 states, primarily in the Midwest.

- *SemCanada* – SemCanada is the largest licensed sour gas processor by capacity in the province of Alberta, Canada. SemCanada owns majority interests in three sour gas processing plants with an aggregate licensed capacity of 1.5 Bcf/d; a 68% working interest in over 600 miles of inter-connected sweet and sour gas gathering

systems; sales gas connections to the TransCanada West (Nova) Gathering System and Alliance Pipeline; additional dehydration and compression facilities and one sweet gas processing plant. Sour gas plants are specially equipped to remove hydrogen sulfide from sour gas, which constitutes approximately 30% of total natural gas production in Canada. For the three months ended March 31, 2007, SemCanada's processing facilities had natural gas throughput of approximately 483,000 Mcf/d. SemCanada's natural gas and crude oil marketing activities consist of wholesale aggregation and retail marketing activities. During the three months ended March 31, 2007, SemCanada marketed more than 431,000 Mcf/d of natural gas and transported and marketed more than 65,000 Bpd of crude oil. SemCanada also owns and operates two blending facilities that marketed and exchanged approximately 14,350 Bpd of crude oil during the three months ended March 31, 2007.

- *SemMaterials* – SemMaterials supplies asphalt products primarily used in road paving and repair to over 2,000 customers in the United States and Mexico, including federal, state and local governmental agencies and national, regional and local contractors. SemMaterials purchases asphalt from refineries, where asphalt is typically a by-product, and supplies both basic asphalt cement and value-added asphalt cutbacks and emulsions to customers. As of March 31, 2007, SemMaterials' assets included 59 owned or leased asphalt terminals in 23 states in the United States and 14 terminals in Mexico, comprising an aggregate of approximately 7.7 million barrels of owned storage capacity, six regional technical centers, 69 trailers and more than 1,000 leased railcars to transport material and more than 25 patents.

- *SemStream* – SemStream purchases, ships, stores, terminals and markets natural gas liquids, or NGLs, with a principal focus on propane. SemStream's assets include ten propane terminals located in the Southern, Midwest and Pacific Northwest regions of the United States, and owned and leased storage capacity of approximately 8.0 million barrels, a majority of which is located at Conway, Kansas, one of the largest NGL hubs in the United States. For the three months ended March 31, 2007, SemStream terminalled and marketed more than 129,000 Bpd of NGLs.

- *SemGas* – SemGas was established in November 2004 to develop natural gas storage to meet a growing need for peak-day natural gas deliverability and "swing" gas capability at local distribution companies and gas-fired electric power producers. To date, its activities have consisted primarily of acquiring and developing natural gas storage assets and related natural gas gathering, transportation and processing assets, including the Wyckoff depleted \

natural gas reservoirs in Steuben County, New York; the Cohocton salt caverns located in the same area; and a natural gas processing plant and 647 miles of natural gas gathering pipelines in Kansas and Oklahoma In addition, in October 2006 SemGas completed the acquisition of substantially all of the assets of Dornick Hills Midstream Ltd., including a natural gas processing plant and approximately 160 miles of a natural gas gathering system in Cooke and Grayson counties in North Central Texas.

- *SemEuro* – SemEuro owns more than 9 2 million barrels of storage capacity for crude oil, gasoline blendstocks and jet fuel that it leases to third parties for a fee Located on the West Coast of the United Kingdom at a deep water port capable of handling tankers carrying up to 1.0 million barrels of product, the facility is located near key United Kingdom refineries with pipeline connectivity. Our Parent has established a marketing office in Geneva, Switzerland that is primarily responsible for sourcing foreign crude oil and refined products, storing the product in Europe and delivering the product to East Coast and Gulf Coast markets in the United States.

45.    In light of the dependency on the Parent, defendants were obligated to disclose in the IPO Registration Statement and Prospectus that the Parent's speculative hedging strategy had begun to fail and that it was in need of additional cash to post as collateral for its trading positions.

46.    On August 16, 2007, the Company filed its Quarterly Report on Form 10-Q for the quarter ending June 30, 2007 ("June 2007 10-Q"). Once again, while the June 2007 10-Q discussed the extensive business relationship between the SGLP and its Parent, there was no disclosure that the Parent was in serious financial trouble, or had invested in unauthorized and highly speculative crude oil hedges which put SGLP's future in serious jeopardy. The June 2007 10-Q was signed by the General Partner, Stallings and Brochetti.

47.    On November 14, 2007, the Company filed its Quarterly Report on Form 10-Q for the quarter ending September 30, 2007 ("September 2007 10-Q"). Once again, while the September 2007 10-Q discussed the extensive business relationship between the SGLP and its Parent, there was no disclosure that the Parent was in serious financial trouble, or had invested in unauthorized and

highly speculative crude oil hedges which put SGLP's future in serious jeopardy. The September 2007 10-Q was signed by the General Partner, Stallings and Brochetti.

48. On January 18, 2008, after the close of trading, SGLP announced that it had filed a Registration Statement for a public offering of 6 million of its common units to raise money to consummate the SemMaterials transaction.

49. On February 12, 2008, SGLP filed an Amendment No. 1 to S-1 Registration Statement and Prospectus with the SEC for the sale of 6 million units of SGLP at $23.90 per unit.

50. The Secondary Offering Registration Statement and Prospectus were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

51. On or about February 20, 2008, the Company completed the Secondary Offering and the acquisition of SemMaterials, which involved the sale of 6 million common units at $23.90 per unit, for proceeds of $137 million. In addition, the Company announced that it had borrowed an additional $241 million to complete the acquisition

52. The Secondary Offering Registration Statement and Prospectus made substantially similar representations about SGLP's relationship with the Parent and the risks surrounding the Parent's business operations as contained in the IPO Registration Statement and Prospectus. The Secondary Offering material further failed to disclose that the Parent's speculative hedging strategy had begun to fail and that it was in need of additional cash to post as collateral for its trading positions.

53. On March 6, 2008, the Company filed its Annual Report on Form 10-K for the year ending December 31, 2007 ("2007 Annual Report"). While the 2007 Annual Report extolled the

virtues of the relationship with the Parent, there was no disclosure that the Parent was in serious financial trouble, or had invested in unauthorized and highly speculative crude oil hedges which put SGLP's future in serious jeopardy. The 2007 Annual Report was signed by the General Partner and the Individual Defendants.

54. On May 8, 2008, the Company filed its Quarterly Report on Form 10-Q for the quarter ending March 31, 2008 ("March 2008 10-Q"). Once again, while the March 2008 10-Q discussed the extensive business relationship between SGLP and its Parent, there was no disclosure that the Parent was in serious financial trouble, or had invested in unauthorized and highly speculative crude oil hedges which put SGLP's future in serious jeopardy. The March 2008 10-Q was signed by the General Partner, Brochetti and Stallings.

### THE TRUTH IS REVEALED

55. The true facts were first revealed to the market on Thursday, July 17, 2008. On July 17, 2008, SGLP lost 52% of its market value, falling $11.80 to $11.00 per unit on high volume. After the close of the market, SGLP issued a statement saying that its Parent "is experiencing liquidity issues" and is considering alternatives, including "a voluntary petition for reorganization under Chapter 11." SGLP confirmed on that announcement that it generated a "substantial majority" of its revenue from the Parent. In fact, it was reported on *Bloomberg News* that "about 80% of [SGLP's] cash flows via throughput and terminal agreements" derived from its Parent.

56. On Monday, July 21, 2008, the Parent and two dozen of its affiliates filed bankruptcy petitions in the U.S. Bankruptcy Court in Wilmington, Delaware.

57. Information revealed in the Declaration of Terrence Ronan, a Senior Vice President, Finance, of the Parent, filed in the bankruptcy matter of *In re SemCrude, L.P.*, Case No. 1 08-11525 (BLS) (Bankr. D. Del.) (J 22), demonstrates that the true facts evidencing the Parent's declining financial conditions were in existence prior to the IPO and Secondary Offering:

Historically, the SemGroup Companies and their affiliates aimed to establish a margin on their anticipated purchases of product inventory by selling that product for physical delivery to customers or by entering into future delivery obligations under futures contracts on the NYMEX and OTC markets. Through these transactions, the SemGroup Companies and their affiliates sought to maintain a position that is substantially balanced between purchases and sales or future delivery obligations. Such transactions were always subject to a degree of risk. Rising commodity prices or an expectation of rising prices increased the cash needed to manage commodity price exposure and thereby increased liquidity requirements, limited amounts available through borrowing, and reduced the volume of petroleum products to be purchased. The volatility experienced in petroleum product prices during the last two years has been unprecedented. As a result, the SemGroup Companies' trading strategy began to fail. For example, from January 2006 to June 2008, the NYMEX West Texas Intermediate benchmark price increased $66.75 per barrel. During the three months ended March 31, 2008, the SemGroup Companies and their affiliates posted $1.96 billion to satisfy margin deposit requirements, a 115% increase over the three months ended March 31, 2007. During the twelve months ended December 31, 2007, the SemGroup Companies and their affiliates posted $1.70 billion to satisfy margin deposit requirements, a 159% increase over the twelve months ended December 31, 2006.

58.    On July 21, 2008, SGLP announced in the form of a press release, that on July 18, 2008, SGLP had been taken over by debtors of the Parent as a result of the Parent defaulting on a secured loan to Manchester Securities ("Manchester") and Alerian Capital Management ("Alerian") (collectively the "New Controlling Owners"). Defendants had never disclosed to the unitholders the existence of this secured loan. The press release entitled "Manchester Securities and Alerian Capital Management Assume Control of SGLP; Appoints New Board to Focus on Future of Company," stated in pertinent part:

SemGroup Energy Partners, L.P., today announced that the holders of a secured loan to SemGroup Holdings, L.P. ('Holdings'), Manchester Securities and Alerian Capital Management, have acted on their rights under their loan documents to vote as the sole members of the general partner of SGLP. They remain fully supportive of existing management.

"These actions are necessary to protect SGLP and allow SGLP to focus on its future and best interests. Despite the challenges faced by SGLP given the uncertainty at its main customer, Semgroup L.P., the board and management are enthusiastic about the Company's strategic assets and future in a robust energy market," Chief Executive Officer Kevin Foxx said.

Manchester and Alerian have reconstituted a five-member board of directors at SGLP's general partner to include two representatives from Manchester, one from Alerian, and two existing independent directors. The new board and management believe this is the beginning of a new era for SGLP, and they will be working together to maximize the long-term utilization of the Company's assets.

59.    In the accompanying Form 8-K filed with the SEC on July 21, 2008, SGLP described

the events leading up to the takeover of the Partnership in pertinent part:

Item 5.01.  Changes in Control of Registrant.

On the evening of July 18, 2008, Manchester Securities Corp. and Alerian Finance Partners, LP (the "New Controlling Owners"), exercised certain rights under a Loan Agreement, dated June 25, 2008 (the "Holdings Credit Agreement"), with SemGroup Holdings, L.P. ("Holdings"), the sole member of SemGroup Energy Partners G.P., L.L.C. (the "General Partner"), which is the general partner of SemGroup Energy Partners, L.P. (the "Partnership"). Under the Holdings Credit Agreement, the New Controlling Owners have the right to direct the vote of all of the membership interests of the General Partner upon an event of default under the Holdings Credit Agreement. The New Controlling Owners exercised these voting rights on July 18, 2008 and effectively took control of the General Partner (the "Change of Control").

The Change of Control resulted in an event of default under the Partnership's Amended and Restated Credit Agreement, dated February 20, 2008 (the "Credit Agreement"), among the Partnership, Wachovia Bank, National Association, as Administrative Agent, L/C Issuer and Swing Line Lender, Bank of America, N.A., as Syndication Agent and the other lenders from time to time party thereto. Under the terms of the Credit Agreement, the lenders may, among other remedies, declare all outstanding amounts under the Credit Agreement immediately due and payable. The Partnership is in productive dialogue with the agent for the lenders regarding this matter.

Item 5.02.  Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

In connection with the Change of Control, on July 18, 2008, the New Controlling Owners reconstituted the Board of Directors of the General Partner (the "Board"). Messrs. Thomas L. Kivisto, Gregory C. Wallace, Kevin L. Foxx, Michael J. Brochetti and Andy Bishop were removed from the Board. Mr. Bishop had also served as a member of the conflicts committee, audit committee and compensation committee of the Board. Messrs. Sundar S. Srinivasan, David N. Bernfeld and Gabriel Hammond were appointed as directors on the Board. Mr. Srinivasan has been elected as Chairman of the Board. Messrs. Brian J. Billings and Edward F. Kosnik remained as directors of the Board and will continue to serve as members of the conflicts committee, audit committee and compensation committee of the Board.

- 23 -

60      According to Gabriel Hammond, new director of the General Partner of SGLP and Managing Partner of Alerian, the "spirit" of the loan agreement was that "if for whatever reason our collateral (*i.e.* the subordinated units) was in jeopardy, we would have the ability to control our own destiny." As a result of the Parent's default on its loan obligations, the SGLP board is now controlled by Manchester and Alerian who are now debtholders, and not merely unitholders, whose interests are in direct conflict with the public unitholders. In addition, the partnership distributions are now subject to, in the first instance, the legal rights of the debtholders.

61.      On August 1, 2008, *The Wall Street Journal* reported on the takeover of SGLP by Alerian and Manchester in an article entitled "How Funds' SemGroup Bet May Yet Pay – Default Terms on $150 Million Loan Give Public Affiliate to Alerian, Manchester." Specifically, it stated:

> SemGroup LP's collapse could make winners out of two little-known hedge funds that tossed the energy company a lifeline shortly before it filed for bankruptcy protection.
>
> In late June, Alerian Capital Management LLC, of Dallas, and Manchester Securities Corp., of New York, agreed to lend $150 million to SemGroup. The hedge funds, both experienced energy investors, were approached by SemGroup at a time when it needed cash to meet margin calls on futures contracts and derivative trades that went against the closely held Tulsa, Okla., company.
>
> The loan came with steep terms. Defaulting would give the two hedge funds SemGroup's interest in a profitable, publicly traded affiliate that owns more than 1,200 miles of pipelines and a large collection of energy-storage facilities at a delivery hub in Cushing, Okla., among other assets.
>
> SemGroup Energy Partners LP, the publicly traded affiliate of SemGroup, known by its ticker symbol SGLP, held "most of the group's best assets," said Andrew Feltus, a money manager at Pioneer Investments in Boston. Pioneer used to own some SemGroup bonds but sold them earlier this year.
>
> Days before filing for bankruptcy protection on July 22, SemGroup defaulted on the loan, giving Alerian and Manchester control of SGLP.
>
> While the parent's demise surprised some people at the hedge funds, they have been reassuring other shareholders that SGLP will stay in business, even though more than 80% of SGLP's revenue comes from SemGroup, whose main business is

running pipelines and storage facilities for oil and natural gas. SGLP didn't file for protection from its creditors.

If SGLP can steady itself and win new transportation and storage contracts from other companies in the region, the firm likely will attract new revenue sources – and rescue its ailing stock price. That, and regular cash distributions SGLP makes to its holders, could help the hedge funds recoup their investment and profit from it in the longer run.

The shares have plunged 66% since June 25. In 4 p.m. Nasdaq Stock Market composite trading Thursday, they rose 3.2%, or 27 cents, to $8.72.

The loan by Alerian and Manchester could emerge as a source of contention in SemGroup's bankruptcy proceedings. Some of SemGroup's other lenders – owed a total of more than $3 billion – said they were unaware of the loan or not fully informed of its terms.

Equity holders in the private company that is in Chapter 11, SemGroup, include a fund sponsored by private-equity firms Carlyle Group LLC and Riverstone Holdings LLC, and Illinois hedge fund Ritchie Capital Management LLC.

Their stakes have shriveled in value. The Carlyle-Riverstone fund invested $75 million in SemGroup in 2005 in exchange for a 29.3% stake. Ritchie acquired a 25% ownership position in 2004.

It isn't known if SemGroup tried to raise cash from Carlyle, Riverstone and Ritchie before the company's collapse or if those investors had to sign off on the loan by Alerian and Manchester.

"By the time SemGroup reached out to the two hedge funds for capital, management had probably exhausted other options," such as raising capital from banks or existing investors, said Mark Easterbrook, an analyst at RBC Capital Markets. In a recent report, he said SGLP's pipeline, storage and terminal assets should remain viable with contracts from other energy companies, though cash flows could be impaired in the near term.

In a conference call with SGLP investors last week, Sundar Srinivasan, a portfolio manager at Elliott Associates LP, which controls Manchester, compared the situation with a building that sits on prime Manhattan real estate.

"If a building on Park Avenue suddenly lost all its tenants, how much less valuable would it be?" he asked. While the building might lose some rental income while it returned to full occupancy, it still would make profits from future rents, he reasoned.

"SGLP is not very different," Mr. Srinivasan said. "This country still needs the energy and materials that flow through SGLP's trucks, pipes, tanks and terminals."

62    As a result of all the foregoing, including defendants non-disclosure of pertinent material information, the U.S. Attorney's Office, SEC and federal regulators have initiated investigations into the Parent and SGLP. The focus of those investigations include the Parent's unauthorized and speculative hedging transactions, as well as a probe of SGLP's disclosure practices.

## LOSS CAUSATION

63.    Defendants' unlawful conduct alleged herein directly caused the losses incurred by plaintiff and the Class. The false and misleading statements set forth above were widely disseminated to the securities markets, investment analysts and to the investing public. Those false and misleading statements, which materially misrepresented the Company's financial results, among other things, caused and maintained the artificial inflation of the price of SGLP common units, and caused those securities to trade at prices in excess of their true value. The Company's announcement on July 17, 2008 corrected the previously issued false and misleading statements by revealing that the Parent had been actively executing unauthorized, highly speculative hedging transactions which ultimately led to it filing for bankruptcy protection under Chapter 11.

64.    This disclosure corrected the artificial inflation in the price of SGLP's securities. As a result of their purchases of SGLP common units during the Class Period, plaintiff and the Class suffered economic harm, *i.e.*, damages, under the federal securities laws.

## COUNT I

### Violations of §11 of the 1933 Act
### Against Defendant SGLP, the Individual Defendants
### and the Underwriter Defendants

65.    This Count is asserted against SGLP, the Individual Defendants and the Underwriter Defendants for violations of §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of all members of the

Class who purchased or otherwise acquired the SGLP securities issued in the IPO or the Secondary Offering.

66.    This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Plaintiff does not allege that the Individual Defendants or the Underwriter Defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

67.    The Registration Statements, and the Prospectuses incorporated therein, were false and misleading, contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts as described above.

68.    SGLP is the registrant for the IPO. As issuer of the common units that were registered, SGLP is strictly liable to plaintiff and members of the Class who purchased or otherwise acquired the SGLP securities issued in the IPO and Secondary Offering pursuant to the Registration Statements for the misstatements and omissions contained therein.

69.    The Individual Defendants were executive officers and/or directors and representatives of SGLP at the time the Registration Statements became effective and were responsible for the contents and dissemination of the Registration Statements. Further, all the Individual Defendants signed or authorized the Registration Statements. As such, the Individual Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading written statements that were contained in the Registration Statements, which misrepresented or failed to disclose, among other things, the facts set forth above. By reason of the conduct alleged herein, each of these defendants violated §11 of the 1933 Act.

70.    As officers and/or directors of SGLP, the Individual Defendants owed to the purchasers of the securities issued in the IPO and the Secondary Offering the duty to make a

reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially false and misleading. The Individual Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading. Accordingly, the Individual Defendants are liable to plaintiff and the other members of the Class who purchased SGLP securities issued in the IPO and Secondary Offering pursuant to the Registration Statements

71. As underwriters of the IPO, the Underwriter Defendants owed to the purchasers of the securities issued in the IPO and Secondary Offering the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially false and misleading. The Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading. Accordingly, the Underwriter Defendants are liable to plaintiff and the other members of the Class who purchased SGLP securities issued in the IPO and Secondary Offering pursuant to the Registration Statements.

72. Plaintiff and other members of the Class who acquired the securities in the IPO and Secondary Offering pursuant to the Registration Statements, did not know of the wrongful conduct alleged herein or of the facts concerning the false and misleading statements and omissions alleged herein, and could not have reasonably discovered such facts or wrongful conduct.

73.    None of the misrepresentations or omissions alleged herein were forward looking statements but, rather, concerned existing facts. Moreover, defendants did not properly identify any of these statements as forward-looking statements and did not disclose information, known to them, that undermined the validity of those statements.

74.    Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based and less than three years have elapsed from the time that the securities upon which this Count is brought were bona fide offered to the public.

75.    Plaintiff and the other members of the Class have sustained damages. The value of SGLP common units sold in the IPO and Secondary Offering have declined substantially subsequent to and due to the violations of §11 of the 1933 Act by SGLP, the Individual Defendants and the Underwriter Defendants.

76.    By reason of the foregoing, SGLP, the Individual Defendants and the Underwriter Defendants named in this Count are liable for violations of §11 of the 1933 Act to plaintiff and the other members of the Class who purchased or otherwise acquired SGLP common units in the IPO and Secondary Offering pursuant to the Registration Statements.

## COUNT II

### Violations of §12(a)(2) of the 1933 Act
### Against Defendants SGLP, SemGroup Holdings and the Underwriter Defendants

77.    This Count is asserted against SGLP, SemGroup Holdings and the Underwriter Defendants for violations of §12(a)(2) of the 1933 Act, 15 U.S.C. §77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired securities in the IPO and Secondary Offering.

78.    This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Plaintiff does not allege for purposes of this Count that the Underwriter Defendants had scienter or fraudulent intent, or that SGLP or SemGroup Holdings' liability under this Count arises from any scienter or fraudulent intent which are not elements of a §12(a)(2) claim

79.    SGLP issued the Prospectuses and was an offeror and/or solicitor of sales of securities offered pursuant to the Prospectuses that formed a part of the Registration Statements. The Prospectuses contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts, as set forth above. SGLP's actions and solicitations included participating in the preparation of the materially false and misleading Prospectuses.

80.    As the issuer of the securities, SGLP is strictly liable for the materially false and misleading statements contained in the Registration Statements and Prospectuses.

81.    SemGroup Holdings sold securities, and was a seller, offeror, and/or solicitor of sales of securities offered pursuant to the Prospectus that formed a part of the Registration Statement in the IPO. The Underwriter Defendants were sellers, offerors, and/or solicitors of sales of securities offered pursuant to the Registration Statements and Prospectuses in the IPO and Secondary Offering. The Prospectuses contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts, as set forth above. SemGroup Holdings' and the Underwriter Defendants' actions and solicitations included participating in the preparation of the materially false and misleading Prospectuses.

82.    The Underwriter Defendants are sellers within the meaning of the 1933 Act because they: (a) transferred title to plaintiff and other members of the Class who purchased SGLP common

units; (b) transferred title of SGLP common units to other underwriters and/or broker-dealers that sold those securities as agents for the Underwriter Defendants; and (c) solicited the purchase of SGLP common units by plaintiff and other members of the Class, motivated at least in part by the desire to serve the Underwriter Defendants' own financial interest and the interests of SemGroup Holdings and SGLP, including but not limited to commissions on their own sales of SGLP securities and separate commissions on the sale of those securities by non-underwriter broker-dealers.

83. SemGroup Holdings and the Underwriter Defendants owed to plaintiff and all other purchasers or other acquirers of securities in the IPO and Secondary Offering the duty to make a reasonable and diligent investigation of the statements contained in the offering materials, including the Prospectuses, to ensure that such statements were true and that there was no omission of material fact necessary to prevent the statements contained therein from being misleading. SemGroup Holdings and the Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading. Accordingly, SemGroup Holdings and the Underwriter Defendants are liable to plaintiff and the other members of the Class who purchased SGLP securities in the IPO and Secondary Offering.

84. Plaintiff and other members of the Class purchased or otherwise acquired securities in the IPO and Secondary Offering pursuant to the materially false and misleading Prospectuses and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses.

85. Plaintiff and other members of the Class offer to tender to SGLP, SemGroup Holdings and the Underwriter Defendants those SGLP securities that the members of the Class

continue to own in return for the consideration paid for those securities, together with interest thereon.

86.    By virtue of the conduct alleged herein, SGLP, SemGroup Holdings and the Underwriter Defendants violated §12(a)(2) of the 1933 Act. Accordingly, plaintiff and other members of the Class who purchased in the IPO or the Secondary Offering pursuant to the Prospectuses have the right to rescind and recover the consideration paid for their securities, and hereby elect to rescind and tender their securities to SGLP, SemGroup Holdings and the Underwriter Defendants. Plaintiff and the members of the Class who have sold their securities purchased in the IPO or Secondary Offering are entitled to rescissory damages.

### COUNT III

### Violations of §15 of the 1933 Act
### Against Defendants SemGroup Holdings and SemGroup GP

87.    This Count is asserted against SemGroup Holdings and SemGroup GP for violations of §15 of the 1933 Act, 15 U.S.C. §77o, on behalf of all members of the Class who purchased or otherwise acquired securities in connection with the IPO and Secondary Offering pursuant to the Registration Statements and Prospectuses.

88.    This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. For purposes of this Count, plaintiff does not allege that SemGroup Holdings' and SemGroup GP's liability under this Count arises from any scienter or fraudulent intent, which are not elements of a §15 claim.

89.    At all relevant times, SemGroup Holdings and SemGroup GP were "controlling persons" of the Company within the meaning of §15 of the 1933 Act. Prior to the creation of SGLP as a separate entity, SemGroup Holdings owned and controlled the SGLP's predecessor(s). Following the creation of SGLP, and through the date of the IPO, SGLP was owned 100% by

SemGroup Holdings. Pursuant to the IPO, SemGroup Holdings sold 14,375,000 common units to the public (amounting to a 52.3% Limited Partner Interest in SGLP) and 511,643 General Partner Units to SemGroup GP (amounting to a 2% General Partner Interest) while retaining 12,570,504 Subordinated Units (amounting to a 45.7% Limited Partner Interest). SemGroup GP controls SGLP as General Partner.

90.     SemGroup Holdings and SemGroup GP at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of SGLP's business affairs. SemGroup Holdings and SemGroup GP participated in the preparation and dissemination of the Registration Statements, and otherwise participated in the process necessary to conduct the IPO and subsequent Secondary Offering. Through its position of control and authority as the controlling owner of SGLP, SemGroup Holdings and SemGroup GP were able to, and did, control the contents of the Registration Statements which contained materially false financial information.

91.     By reason of the aforementioned conduct, SemGroup Holdings and SemGroup GP are liable under §15 of the 1933 Act, jointly and severally with, and to the same extent as the Company is liable under §§11 and 12(a)(2) of the 1933 Act, to plaintiff and the other members of the Class who purchased units in the IPO and Secondary Offering. As a direct and proximate result of SemGroup Holdings' and SemGroup GP's conduct, plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of SGLP common units.

### COUNT IV

### Violations of §15 of the 1933 Act
### Against the Individual Defendants

92.     This Count is asserted against the Individual Defendants for violations of §15 of the 1933 Act, 15 U.S.C. §77o, on behalf of plaintiff and the other members of the Class who purchased

or otherwise acquired securities in connection with the IPO and Secondary Offering pursuant to the Registration Statements and Prospectuses.

93.    This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Plaintiff does not allege that the Individual Defendants had scienter or fraudulent intent which are not elements of a §15 claim.

94.    At all relevant times, the Individual Defendants were "controlling persons" of the Company within the meaning of §15 of the 1933 Act. Each of the Individual Defendants served as an executive officer and/or director of SGLP.

95.    Each of the Individual Defendants at all relevant times participated in the operation and management of SGLP, and conducted and participated, directly and indirectly, in the conduct of SGLP's business affairs. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to SGLP's financial condition and results of operations. The Individual Defendants participated in the preparation and dissemination of the Registration Statements, and otherwise participated in the process necessary to conduct the IPO and Secondary Offering. Because of their positions of control and authority as senior officers and directors of SGLP, the Individual Defendants were able to, and did, control the contents of the Registration Statements which contained materially false financial information.

96.    By reason of the aforementioned conduct, each of the defendants named in this Count is liable under §15 of the 1933 Act, jointly and severally with, and to the same extent as the Company is liable under §§11 and 12(a)(2) of the 1933 Act, to plaintiff and the other members of the Class who purchased securities in the IPO and Secondary Offering. As a direct and proximate result

of the conduct of the Individual Defendants, plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Company units.

## COUNT V

### Violations of §10(b) of the 1934 Act
### Against SGLP, SemGroup Holdings, Semgroup GP and the Individual Defendants

97.   Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein. This Count is asserted against SGLP, SemGroup Holdings, SemGroup GP and the Individual Defendants for violations of §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

98.   Prior and throughout the Class Period, SGLP, SemGroup Holdings, SemGroup GP and each of the Individual Defendants, individually and in concert with others, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails and a national securities exchange, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; made the above statements with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and, during the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, regarding, among other things, the Parent's adverse financial condition, and specifically its speculative, dangerous and unauthorized trading and resultant liquidity issues as early as 2006; (ii) fail to disclose the existence of a secured loan to the Parent which, upon Parent's seeming default, allowed the transfer of control of SGLP to debtors, Manchester and Alerian, whose interests are in direct conflict with plaintiff and the Class; (iii) artificially inflate and maintain the market

price of SGLP common units; and (iv) cause plaintiff to purchase SGLP common units at artificially inflated prices.

99.    Defendant SGLP and the Individual Defendants, as the top executive officers and/or directors of SGLP, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers of SGLP, the Individual Defendants were able to control and did control the content of the public statements contained herein and, with knowledge or in reckless disregard, they caused the above complained of public statements to contain misstatements and omissions of material facts as alleged herein.

100.    Defendant SGLP is liable for each of the materially false and misleading statements set forth herein, including each of the statements of the Individual Defendants, under the principles of *respondeat superior*.

101.    In addition, the false and misleading statements made in SGLP's published documents (including but not limited to its press releases and SEC filings) constitute group published information, which the Individual Defendants were responsible for creating. During their respective terms of employment at SGLP, the Individual Defendants had direct involvement in the daily business of SGLP and participated in the preparation and dissemination of SGLP's group published information.

102.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SGLP common units. Plaintiff and the Class would not have purchased SGLP common units at the price they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

103    The Individual Defendants, SGLP, SemGroup Holdings and SemGroup GP acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of SGLP were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding SGLP, their control over, and/or receipt and/or modification of SGLP's allegedly materially misleading misstatements and/or their associations with SGLP which made them privy to confidential proprietary information concerning SGLP, participated in the fraudulent scheme alleged herein.

104    The motive of the Individual Defendants, SGLP, SemGroup Holdings and SemGroup GP was to raise substantial capital in the Secondary Offering to provide cash to the Parent to ease its undisclosed material liquidity problems caused by its risky hedging strategy. In furtherance of this scheme, the defendants caused SGLP to disseminate the Secondary Offering Prospectus so as to raise approximately $137 million from the investing public, plus borrowed funds, which would be paid to the Parent.

## COUNT VI

### Violation of §20(a) of the 1934 Act
### Against the Individual Defendants, SemGroup Holdings and SemGroup GP

105    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein. This Count is asserted against the Individual Defendants, SemGroup Holdings and SemGroup GP for violations of §20(a) of the 1934 Act.

106    SGLP committed a primary violation of §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, by making the false and misleading

statements of material facts, identified above, in connection with the purchase or sale of securities, which constituted a fraud on the market and were, therefore, presumed to have been relied upon by plaintiff and the Class. At the time that it made these false and misleading statements, SGLP either knew of, or recklessly disregarded, their falsity

107.    Each of the Individual Defendants, as well as SemGroup Holdings and SemGroup GP had direct control and/or supervisory involvement in the operations of SGLP prior to and during the Class Period, and therefore had the power to control or influence the particular transactions giving rise to the violations of the 1934 Act by SGLP as alleged herein, and exercised the same.

108.    By reason of their status as officers and/or directors of SGLP during the Class Period, the Individual Defendants, SemGroup Holdings and SemGroup GP are "controlling persons" of SGLP within the meaning of §20(a) of the 1934 Act because they had the power and influence to cause SGLP to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants, SemGroup Holdings and SemGroup GP were able to, and did, directly or indirectly, control the conduct of SGLP's business, the information contained in its filings with the SEC, and public statements about its business

109.    Each of the Individual Defendants, SemGroup Holdings and SemGroup GP were provided with or had access to copies of SGLP's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

110.    The Individual Defendants each signed or authorized the Registration Statements and thereby controlled their contents and dissemination, including the dissemination of the Prospectuses contained therein. By reason of their status as directors of SGLP at the time of the IPO and

Secondary Offering and their signing or authorizing of the Registration Statements, these defendants were "controlling persons" of SGLP within the meaning of §20(a) of the 1934 Act as of the time of the IPO and Secondary Offering because they had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. The Individual Defendants participated in the preparation and dissemination of the Registration Statements, and otherwise participated in the process necessary to conduct the IPO and Secondary Offering. Because of their positions of control, these defendants were able to, and did, directly or indirectly, control the conduct of the IPO and Secondary Offering and the information contained in the Registration Statements and Prospectuses, and the dissemination thereof.

111. As set forth above, each of the Individual Defendants, SemGroup Holdings and SemGroup GP controlled SGLP, which violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this complaint. By virtue of their positions as "controlling persons," these defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate cause of the wrongful conduct set forth in this Count, plaintiff and other members of the Class suffered damages in connection with their purchases of SGLP's common units in the IPO, Secondary Offering and during the Class Period

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A        Declaring this action to be a plaintiff class action properly maintained pursuant to Rule 23(a) and (b) (3) of the Federal Rules of Civil Procedure;

B        Appointing plaintiff as lead plaintiff and class representative and his counsel as lead class counsel;

C.       Awarding plaintiff and other members of the Class damages together with pre-judgment interest thereon;

- 39 -

D.    Awarding plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.    Awarding plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: August 7, 2008                    WEISS & LURIE

Joseph H. Weiss (JW-4534)
Moshé Balsam (MB-0390)
Mark D. Smilow (MS-2809)
551 Fifth Avenue
New York, NY  10176
(212) 682-3025
(212) 682-3010 (Fax)


COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
Darren J. Robbins
Ramzi Abadou
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
(619) 231-1058
(619) 231-7423 (Fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
Samuel H. Rudman
David A. Rosenfeld
58 South Service Road, Suite 200
Melville, NY  11747
(631) 367-7100
(631) 367-1173 (Fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt SemGroup Energy Partners doc

CERTIFICATION OF PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

MICHAEL RUBIN ("Plaintiff") certifies as follows:

1.    I have reviewed a draft complaint against SemGroup Energy Partners L.P. and others and authorize its filing.

2.    I did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this private action.

3.    I am willing to serve as the representative party, including providing testimony at deposition and trial, if necessary.

4.    On July 17, 2007, I purchased 1,100 common units of SemGroup Energy Partners L.P. in the IPO at a price of $22.00. The following are my sales in SemGroup Energy Partners L.P. common units:

07/18/07 – 100 shares – $30.25

12/19/07 – 200 shares – $26.13

I still retain 800 common units of SemGroup Energy Partners L.P.

5.    I have not sought to serve as the representative party in any federal securities case in the last three years except in the following cases:

Kim v. Lee et al., 06 cv 02951 (TPG) (S.D.N.Y.)

Rubin v. MF Global Ltd., et al., 08 cv 2233 (VM) (S.D.N.Y.)

6.    I will not accept any payment for serving as the representative party beyond Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

7.    I hereby certify, under penalty of perjury, that the foregoing is true and correct to the best of my current knowledge, information and belief.

DATED:    August 6, 2008

Michael Rubin